The PEOPLE of the State of Colorado,
Plaintiff–Appellant

v.

Calen HOWARD, Defendant–Appellee.

No. 04SA61.

Supreme Court of Colorado,
En Banc.

June 7, 2004.

Stuart A. VanMeveren, District Attorney, Benjamin L. Lammons, Deputy District Attorney, Fort Collins, Colorado, Attorneys for Plaintiff–Appellant.

Stefani Goldin, Joseph A. Gavaldon, Fort Collins, Colorado, Attorneys for Defendant–Appellee.

Justice MARTINEZ delivered the Opinion of the Court.

Pursuant to C.A.R. 4.1, 12 C.R.S. (2003), the People have filed an interlocutory appeal challenging an order of the Larimer County District Court suppressing statements made by a juvenile suspect, Calen Howard, without the presence of a responsible adult. Police contacted Howard at his home, asked if he would mind stepping outside, and questioned him about the sexual assault allegations his sister had made against him. After reviewing the totality of the circumstances, the trial court found that Howard was in custody and thus, in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and section 19–2–511(1), 6 C.R.S. (2003), suppressed all incriminating statements made by Howard during this police contact. In rendering its decision, the trial court relied almost exclusively on its finding that the officers in this case intended to separate Howard from his parents in order to question him in isolation. Upon review, we ultimately conclude that Howard was not in custody.

I.

## FACTS AND PROCEEDINGS BELOW

While swimming at a local pool on September 3, 2002, C.H. (the sixteen-year old alleged victim in this case) informed her friends that her seventeen-year old brother, Calen Howard, had sexually abused her.

C.H. indicated that the abuse occurred over a period of time, but that Howard recently kissed her breast. C.H.'s friends related the allegations to the lifeguard on duty and the lifeguard called 911 to report the incident.

Following the 911 call, Officer Jerrod Hardy was dispatched to the scene. Officer Hardy requested that C.H. be interviewed at the Child Advocacy Center. Sometime between 5:45 p.m. and 7:00 p.m., C.H. was interviewed at the Child Advocacy Center and the interview was videotaped. During the interview, C.H. accused both Howard and her father, Allen Howard, of sexually abusing her. Detective Ginger Mohs observed the entire interview and Detective Mohs asked C.H. a few clarification questions once the interview concluded.

While C.H. was being interviewed, C.H.'s parents became worried that she had failed to come home and C.H.'s mother, Debra Howard, telephoned the Fort Collins Police Department to report her as missing. Detective Mohs was alerted that Mrs. Howard had been trying to locate C.H. Detective Mohs telephoned Mrs. Howard, told her that C.H. was safe, and informed Mrs. Howard that the police wanted to speak with both parents and thus directed them to go to the Fort Collins Police Department. Detective Mohs did not reveal that Howard and his father were sexual assault suspects. Additionally, Detective Mohs asked Mrs. Howard where her son could be located. Mrs. Howard responded that Howard was at work. Following this conversation, both parents traveled directly to the Fort Collins Police Department.

Detective Mohs and Officer Hardy next attempted to locate Howard. They traveled to his place of employment, but were informed that he was not working that day. Upon leaving the place of employment, Detective Mohs received a call from Department of Human Services (DHS) caseworker, Jana Klussman. Klussman told Detective Mohs that she was with C.H. and that they were going to C.H.'s home so that she could retrieve some personal items. Detective Mohs and Officer Hardy agreed to meet C.H. and Klussman at the house in order to serve as protective standby.

Klussman and C.H. arrived shortly before the police officers. Detective Mohs and Officer Hardy parked their patrol cars down the street and out of sight of the front door of the Howard residence. Detective Mohs, Officer Hardy, Klussman, and C.H. proceeded to the door of the residence together. Both police officers were in uniform. Detective Mohs knocked on the door of the residence and Howard responded. Detective Mohs introduced herself and asked Howard if he would mind coming outside. Howard agreed and walked with the officers to the driveway of the residence. Once in the driveway area, Officer Hardy stood between Howard and the door to the residence.

While these events transpired, Klussman escorted C.H. into the house. Klussman allowed C.H. to quickly retrieve her belongings and then both C.H. and Klussman departed. During the time that C.H. gathered personal items, Howard and Detective Mohs engaged in general conversation.

Once C.H. departed, Detective Mohs asked Howard why he thought the police were at his home. Howard responded that he thought it was because of the long hours his parents had C.H. work at their personal business. Howard indicated that is why he believed a DHS worker accompanied C.H. to the residence. Detective Mohs then informed Howard that the police were there because of his relationship with C.H. and then confronted him with the details of C.H.'s allegations. At this time, Howard slumped over, bowed his head, and appeared very remorseful.

Howard then related to the officers several incriminating statements. Howard admitted that he touched C.H.'s vagina and that he licked and fondled her breasts. He also stated that he and C.H. had both performed oral sex on each other. Howard explained that these incidents occurred more frequently when he did not have a girlfriend, but that he realized what he was doing was wrong after listening to a relationship advice show.

At some point during the time Howard was speaking to Detective Mohs, his parents returned home. The parents asked Howard to go inside the house and the questioning was

terminated. Detective Mohs and Officer Hardy departed, and Howard was not placed under formal arrest until months later. Howard was charged as an adult with one count of sexual assault, section 18–3–402(1)(a), 6 C.R.S. (2003).

Prior to trial, Howard filed a motion to suppress the statements he made on the night of September 3, 2003. The trial court held a hearing on the matter and heard testimony in regard to the events surrounding the questioning of Howard. In a detailed ruling, the court found that Howard was in custody and was questioned outside the presence of a responsible adult without proper advisement of his *Miranda* rights. In rendering its ruling, the court described several circumstances that led the court to find that the officers were involved in a ploy to question Howard without the presence of a responsible adult. Relying upon this finding, the court suppressed all the incriminating statements Howard made after he spoke to the officers about C.H.'s employment situation.

The People filed this interlocutory appeal to challenge the trial court's order suppressing Howard's statements. We hold that the trial court placed undue emphasis on the subjective intent of the officers, and we determine that Howard was not in custody. Thus, we reverse the ruling of the trial court.

## II.

### STANDARD OF REVIEW

In this case, we are called upon to decide whether the trial court made a proper custody determination for purposes of both *Miranda* and, because the suspect was a juvenile, section 19–2–511.

■ Determining whether an individual is in custody for purposes of *Miranda* involves mixed questions of fact and law that require reviewing courts to apply a de novo standard of review. *People v. Matheny*, 46 P.3d 453, 462 (Colo.2002). When ruling on a motion to suppress, a trial court must make "a specific inquiry into the historical phenomenon of the case." *Id.* at 461. A trial court's findings of historical fact are entitled to def-

erence by a reviewing court and will not be disturbed if supported by competent evidence in the record. *Id.* at 462. However, a trial court's application of the controlling legal standard to its findings of historical fact is a matter for de novo appellate review. *Id.* at 461.

■ Although we have not previously stated the standard of review for section 19–2–511, it is identical to the standard for reviewing determinations of *Miranda* custody because custody for purposes of section 19–2–511 is *Miranda* custody. *See In re J.C.*, 844 P.2d 1185, 1189 (Colo.1993).

## III.

### ANALYSIS

In deciding this case, we first discuss the history and purpose behind *Miranda* and the protections it affords suspects that are subject to custodial interrogations. Second, we detail the significance of section 19–2–511 and the special protections that statute provides juveniles who are in custody and being interrogated without the presence of a responsible adult. Next, we address the controlling law and factors a court must consider when making a predicate custody determination. Specifically, we detail the 'reasonable person' and 'totality of the circumstances' standards that a court must utilize in making predicate custody determinations. Finally, we apply these standards to the facts present in this case. We ultimately conclude that, in ordering the suppression of Howard's incriminating statements, the trial court improperly relied upon its findings regarding the subjective intent of the officers. We hold that Howard was not in custody for purposes of *Miranda* and section 19–2–511(1).

### A.

#### *Miranda* Protections

In *Miranda,* the Supreme Court recognized that without adequate safeguards, the process of interrogating suspects who are in custody contains "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."

*Miranda,* 384 U.S. at 467, 86 S.Ct. 1602. Recently, we explained that the Court in *Miranda* was tremendously concerned with the "deprivation of the suspect's freedom followed by his isolation from friends and family." *Matheny,* 46 P.3d at 462. As the Court in *Miranda* noted:

> An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion ... cannot be otherwise than under compulsion to speak.

*Miranda,* 384 U.S. at 461, 86 S.Ct. 1602.

■ Thus, the *Miranda* court held that if a person in custody is subject to an interrogation, he must be informed in clear and unequivocal terms that he has the right to remain silent; that anything he says may be used against him; that he has the right to the presence of an attorney; and that if he cannot afford one, one will be appointed for him. *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602 *Matheny,* 46 P.3d at 462. If a person in custody is not properly apprised of these rights, or fails to make a knowing and intelligent waiver of those rights, the prosecution may not introduce any statement procured from the custodial interrogation in their case in chief. *See People v. T.C.,* 898 P.2d 20, 25 (Colo.1995).

### B.

### Significance of Section 19–2–511

The General Assembly enacted section 19–2–511 [1] in order both to codify the *Miranda* requirements detailed above and to extend those protections to juveniles. *In re J.C.,* 844 P.2d at 1188. However, under section 19–2–511(1), the General Assembly affords juveniles in the custody of law enforcement additional protections. The statute requires the presence of a responsible adult during the custodial interrogation of a juvenile. If a responsible adult is not present during a custodial interrogation, the statute excludes statements made by the juvenile as a result of the custodial interrogation. *Id.; see also People v. Maes,* 194 Colo. 235, 237, 571 P.2d 305, 306 (1977) (noting that the clear purpose of the statute "is to afford a special protection to a juvenile who is in police custody because of alleged criminal acts"). Specifically, section 19–2–511(1) provides that no statements of a juvenile made as a result of a custodial interrogation shall be admissible in evidence unless a responsible adult is present.[2] The statute also requires that when a juvenile is in custody, the juvenile and a responsible adult must be made aware of the juvenile's right against self incrimination and right to counsel during an interrogation. *In re J.C.,* 844 P.2d at 1188.

### C.

### *Miranda* Custody Determinations

■ Before the special statutory protections of section 19–2–511(1) and *Miranda* safeguards can apply, a court must make the predicate determination of whether the juvenile was in custody and being interrogated. *See generally In re R.A.,* 937 P.2d 731, 737 (Colo.1997). The objective test for establishing custody is whether a reasonable person in the suspect's position would consider himself significantly deprived of his liberty. *Jones v. People,* 711 P.2d 1270, 1275 (Colo. 1986); *People v. Black,* 698 P.2d 766, 768 (Colo.1985); *People v. Thiret,* 685 P.2d 193,

---

**1.** Section 19–2–511 was formerly numbered section 19–2–210.

**2.** Section 19–2–511(1) reads:
No statements or admissions of a juvenile made as a result of the custodial interrogation of such juvenile by a law enforcement official concerning delinquent acts alleged to have been committed by the juvenile shall be admissible in evidence against such juvenile unless a parent, guardian, or legal or physical custodian of the juvenile was present at such interrogation and the juvenile and his or her parent, guardian, or legal or physical custodian were advised of the juvenile's right to remain silent and that any statements made may be used against him or her in a court of law, or his or her right to the presence of an attorney during such interrogation, and of his or her right to have counsel appointed if he or she so requests at the time of the interrogation; except that, if a public defender or counsel representing the juvenile is present at such interrogation, such statements or admissions may be admissible in evidence even though the juvenile's parent, guardian, or legal or physical custodian was not present.

203 (Colo.1984).[3] The reasonable person standard is "superior to a subjective test because it is not 'solely dependent either on the self-serving declarations of the police officers or the defendant.'" *Matheny,* 46 P.3d at 465 (quoting *Berkemer v. McCarty,* 468 U.S. 420, 442 n. 35, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

■ In deciding whether a reasonable person in the suspect's position would believe himself to be deprived of his freedom of action, a court must consider the totality of the circumstances under which an interrogation was conducted. *Jones,* 711 P.2d at 1275. Factors a court should evaluate include:

> the time, place and purpose of the encounter; the persons present during the interrogation; the words spoken by the officer to the defendant; the officer's tone of voice and general demeanor; the length and mood of the interrogation; whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; the officer's response to any questions asked by the defendant; whether directions were given to the defendant during the interrogation; and the defendant's verbal or nonverbal response to such directions.

*Id.* at 1275–76. Additionally, a court may consider other factors when weighing the totality of the circumstances in cases involving juveniles. The age of the juvenile is a factor to be considered by the court, though it will not constitute the determinative factor in a finding of custody. *In re J.C.,* 844 P.2d at 1190.[4] Also, a court may consider whether the parents were present or had knowledge of the interrogation. *Id.* at 1189.

**3.** This court has decided that the reasonable person standard that is utilized to determine whether an adult has been placed in custody is similarly applicable to juveniles. *In re J.C.,* 844 P.2d at 1189.

**4.** In *Yarborough v. Alvarado,* No. 02–1684, —— U.S. ——, 124 S.Ct. 2140, 158 L.Ed.2d 938 (U.S. Jun.1, 2004), the Supreme Court held in a 5–4 decision that the state court's failure, in that case, to consider a juvenile's age did not "provide a proper basis for finding that the state court's decision was an unreasonable application of clearly established law" as required by the

## D.

### Application

In this section, we first address the trial court's reliance on the officers' subjective intent when ruling on the issue of custody. We ultimately conclude that the court applied an incorrect legal standard to its findings of historical fact. Next, we discuss the totality of the circumstances present in this case. After reviewing these circumstances and the controlling legal standards, we hold that Howard was not in custody and that the incriminating statements he made were improperly suppressed by the trial court.

### 1. Subjective Intent of the Officers

■ In concluding that a reasonable person in Howard's position would have considered himself significantly deprived of his liberty, the trial court relied almost exclusively on the subjective intent of the officers that contacted Howard. In its order suppressing Howard's incriminating statements, the trial court made several findings regarding what the court perceived as a ploy by the officers to separate Howard from his parents in order to question him in isolation.

The court noted that Detective Mohs was present for the interview with the alleged victim and was familiar with the allegations against both Howard and his father. Detective Mohs then contacted Howard's parents and directed them to the Fort Collins Police Department. The court found it of great significance that Detective Mohs did not ask the parents to bring Howard to the station as well.

After directing the parents to the police station, Detective Mohs and Officer Hardy

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Id.* at 2152. The Court explained that it has not been clearly established that age is a factor that must be considered when a court is making *Miranda* custody determinations. *Id.* at 2150. In concurring with the majority, Justice O'Connor noted that there "may be cases in which a suspect's age will be relevant to the *Miranda* 'custody' inquiry." *Id.* at 2152. In his dissent, Justice Breyer opined that a suspect's age, if known by the police, is an objective factor to be considered in *Miranda* custody determinations. *Id.* at 2154.

set out to find Howard. When the officers failed to find Howard at his place of employment, they next traveled to the Howard residence in order to serve as protective standby for the DHS worker and C.H. At the residence, the officers contacted Howard and questioned him after the DHS worker and C.H. departed. The court found this to be a significant fact proving the officers' ploy. The court concluded that had the officers simply been at the home to serve as protective standby, they would have departed with the DHS worker and C.H. Thus, the court concluded that the officers' true purpose was to separate Howard from his parents in order to question him without their presence.

The trial court appeared to respond to the unfairness that it perceived; nonetheless, the trial court erred by considering the subjective intent of the officers. We have often explained that the objective test for establishing custody is whether a reasonable person in the suspect's position would consider himself significantly deprived of his liberty. *Jones,* 711 P.2d at 1275. This reasonable person standard is superior to a subjective test because it is not dependent on the self-serving declarations of police officers or suspects. *Matheny,* 46 P.3d at 465.

In *Stansbury v. California,* 511 U.S. 318, 323–24, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994), the Supreme Court made clear that an officer's unarticulated plan has no bearing on whether a suspect should be deemed in custody. As the Court stated, "it is well settled, then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda.*" *Stansbury,* 511 U.S. at 324, 114 S.Ct. 1526. Other Supreme Court cases have echoed this reasoning. *See California v. Beheler,* 463 U.S. 1121, 1124 n. 2, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)("Our holding in *Mathiason* reflected our earlier decision in *Beckwith,* in which we rejected the notion that the 'in custody' requirement was satisfied merely because the police interviewed a person who was the 'focus' of a criminal investigation"); *Minnesota v. Murphy,* 465 U.S. 420, 431, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984)("The mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings, and the probation officer's knowledge and intent have no bearing on the outcome of this case").

In this case, the trial court erred by relying on its finding that the officers intended to separate Howard from his parents in order to question him in isolation. As prior cases demonstrate, a trial court's inquiry into whether a suspect is in custody for purposes of *Miranda* is limited to an objective reasonable person standard.

### 2. Custody Analysis

In examining the totality of the circumstances present in this case, we conclude that Howard was not in custody and that the trial court improperly suppressed the incriminating statements he made.

At the outset, we recognize that when a juvenile suspect is confronted with police questioning without the presence of a responsible adult, he may not understand that he is not required to respond. However, the General Assembly has chosen in section 19–2–511 to protect only those juveniles that are in *Miranda* custody. *See* § 19–2–511(1). As such, a court must make a predicate custody determination before it can apply the special protections of section 19–2–511(1).

As we related earlier, inquiry into whether a suspect is in custody for purposes of *Miranda* is "limited to whether, under the totality of the circumstances, a reasonable person in the defendant's position would consider himself to be deprived of his freedom of action to the degree associated with a formal arrest." *Matheny,* 46 P.3d at 468. The totality of the circumstances surrounding the September 3, 2002, interview of Howard suggest that he was not in custody during Detective Mohs's questioning.

The time, place, and purpose of the officers' encounter with Howard indicate that he was not in custody. The officers traveled in the early evening to Howard's home to serve as protective standby for the DHS worker and C.H. *See Beckwith v. United States,* 425 U.S. 341, 346, 96 S.Ct. 1612, 48 L.Ed.2d 1

(1976)(given the totality of the circumstances that existed, questioning that took place at a neutral location, the defendant's home, deemed non-custodial because it was inherently · less coercive than a police dominated setting); *cf. Orozco v. Texas*, 394 U.S. 324, 326–27, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (finding that a neutral locus is not determinative because *Miranda* protections are not limited to police station interrogations). Upon the officers' arrival at his home, Howard was asked to come outside with the officers to the driveway area of the residence. We find it particularly significant that although the trial court found that the officers were engaged in a ploy, it also specifically found that the officers were credible and asked, not directed, Howard to step outside. Howard was not forced to accompany the officers outside. Howard was not asked to come to the police station, nor was he told that he must accompany the officers to that location.

Additionally, Howard's freedom of movement was not restricted by the officers. While Officer Hardy stood between Howard and the door to the residence, Howard was not prevented from leaving the scene. Also, although Howard was not informed that he was free to leave at any time, he was not handcuffed or placed under any other form of physical restraint. Further, the duration of the officers' contact was a relatively brief seven minutes.

Detective Mohs's tone and general demeanor also suggest that Howard was not in custody. Detective Mohs politely spoke with Howard and she engaged in general conversation with him until the DHS worker and C.H. left the residence. Detective Mohs did not raise her voice with Howard and in no way attempted to intimidate him. Additionally, Detective Mohs was honest with Howard. She did not purposefully deceive Howard as to the nature of the officers' visit. Instead, she asked Howard why he thought the police were at his home and indicated to Howard that the reason behind their contact was to inquire as to the nature of Howard's relationship with C.H.

These circumstances indicate that Howard was not in custody for purposes of *Miranda*

and section 19–2–511(1). Although Howard was seventeen-years old and his parents were not present, the. general "atmosphere and tone of the interview certainly did not evince any attempt by police to 'subjugate the individual to the will of his examiner.' " *Matheny* 46 P.3d at 467 (quoting *Miranda*, 384 U.S. at 457, 86 S.Ct. 1602). As the Supreme Court acknowledged in *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), "[any] interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." However, a consensual interview between Howard and Detective Mohs, without the presence of a responsible adult, does not exert the compulsive forces that *Miranda* sought to prevent. *See Matheny*, 46 P.3d at 468. Thus, the trial court erred in finding that Howard was in custody for purposes of *Miranda* and section 19–2–511(1).

We hold that Howard was not in custody and that the trial court improperly suppressed the incriminating statements made by Howard. Accordingly, we reverse the trial court.

## IV.

## OTHER ARGUMENTS

In addition to challenging the trial court's custody determination, the People also contend that the trial court erred in concluding that Howard's statements were involuntary. In its suppression order, the trial court stated that:

If, for some reason, upon review, the court is incorrect in its finding that there was a custodial interrogation here because of the intense focus of the investigation, the court also finds that the defendant did not knowingly and voluntarily make these statements. As found earlier, he did not volunteer them, and that he could not have made a knowing and voluntary waiver under the case law and under the statute because he hadn't been informed of those rights, nor could his parents have made it

on his behalf because they were not informed of those rights.

After reviewing the record, we interpret the trial court's order as addressing the issue of waiver of *Miranda* rights, rather than voluntariness.

In this case, the suppression hearing regarding Howard's statements focused entirely upon the issue of custody. In his argument to the trial court, Howard's attorney acknowledged that Howard was not pressured by the police in any way that might trigger voluntariness concerns and instead urged the court to focus on custody.[5]

 In its ruling on custody, the trial court found that the officers' behavior was beyond reproach during the encounter. The court stated that the officers in no way threatened, coerced, intimidated, or acted inappropriately toward Howard. Such findings are critical because in determining voluntariness, a court specifically considers whether the accused's will was actually overborne by coercive police conduct. *People v. Rivas*, 13 P.3d 315, 318 (Colo.2000); *People v. Valdez*, 969 P.2d 208, 211 (Colo.1998). In this case, the trial court found that Howard's will was not overborne by the coercive conduct of the officers.

 Finally, the trial court held that Howard's statements could come into evidence for purposes of impeachment. A statement that is involuntary cannot be used for any purpose, including impeachment. *New Jersey v. Portash*, 440 U.S. 450, 457, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979). However, a statement that is obtained in violation of *Miranda*, but is otherwise voluntary, is admissible for impeachment as long as there are sufficient indicia of reliability. *Michigan v. Harvey*, 494 U.S. 344, 345–46, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990).

Because voluntariness was not the focus of the suppression hearing, a voluntariness claim was not raised by the defense, the court's findings regarding police conduct suggest Howard's statements were voluntary, and because the trial court indicated that

Howard's statements may be used against him for purposes of impeachment, it appears that the trial court was not addressing voluntariness, but rather whether Howard voluntarily waived his *Miranda* rights.

In light of the fact that we have found that Howard was not in custody for purposes of *Miranda* and section 19–2–511(1), whether Howard's statement must be suppressed does not turn on whether he voluntarily waived his *Miranda* rights.

## V.

## CONCLUSION

We conclude that Howard's incriminating statements were improperly suppressed because the trial court placed undue emphasis on the subjective intent of the officers. We hold that Howard was not in custody. Accordingly, we reverse.

---

5. In his argument to the trial court, Howard's attorney stated:

> I don't believe, and I am not arguing—no way am I insinuating that the manner in which the questions that were made or the questioning of

Mr. Howard that was made with regard to voluntariness rises to the level that he was pressured or something of that nature. I think it's really an issue of custody.