Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
January 28, 2019

**2018 CO 10**

**No. 18SA150,** *People v. Barrios*—Juvenile—*Miranda*—Advisement Waiver.

In this case, the supreme court considers whether a juvenile's *Miranda* advisement waiver was reliable under the totality of the circumstances. We hold that the police detective complied with the provisions of the juvenile *Miranda* waiver statute, section 19-2-511, C.R.S. (2018), and that the concerns identified by the trial court do not undermine the reliability of the waiver. Because both the juvenile and his legal guardian were fully advised of all the juvenile's rights and the juvenile issued a reliable waiver, his statements to police should not be suppressed.

## The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

### 2018 CO 10

### Supreme Court Case No. 18SA150
*Interlocutory Appeal from the District Court*
Jefferson County District Court Case No. 17CR311
Honorable Philip McNulty, Chief Judge

### Plaintiff-Appellant:

The People of the State of Colorado,

v.

### Defendant-Appellee:

Dominic Gabriel Barrios.

### Order Reversed
*en banc*
January 28, 2019

**Attorneys for Plaintiff-Appellant:**
Peter A. Weir, District Attorney, First Judicial District
Donna Skinner Reed, Chief Appellate Deputy District Attorney
*Golden, Colorado*

**Attorneys for Defendant-Appellee:**
Megan A. Ring, Public Defender
Katherine Powers Spengler, Supervising Deputy State Public Defender
*Golden, Colorado*

**JUSTICE BOATRIGHT** delivered the Opinion of the Court.
**JUSTICE MÁRQUEZ** dissents, and **JUSTICE GABRIEL** and **JUSTICE HART** join in the dissent.

¶1    In this interlocutory appeal, the People assert that the trial court erred in suppressing statements of the juvenile defendant, Dominic Barrios.[1] At issue is whether the police sufficiently advised Barrios and his legal guardian of his rights before he waived his *Miranda* rights and agreed to talk to the police, and whether his waiver was reliable under the totality of the circumstances. The trial court found that the prosecution failed to establish a reliable *Miranda* waiver for Barrios under section 19-2-511, C.R.S. (2018), and it ordered that his statements be suppressed. We hold that the police detective complied with section 19-2-511 when he advised Barrios and his legal guardian prior to Barrios's waiver and that, under the totality of the circumstances, the concerns identified by the trial court do not undermine the reliability of the waiver. Therefore, we reverse the trial court's order suppressing Barrios's statements, and we remand to that court for further proceedings consistent with this opinion.

## I. Facts and Procedural History

¶2    H.J. completed her grocery shopping at a Target store in Arvada and walked to her car. Barrios was also at the Target. According to the arrest warrant,[2] after H.J. entered her vehicle, Barrios opened the back door, got in the back seat, put his arm around H.J.'s throat, pulled out a knife, and told her to drive. During the encounter, Barrios took

---

[1] Although Barrios was charged as an adult, he was sixteen years old at the time of the incident. Hence, we consider him a juvenile for purposes of this opinion.

[2] Because the underlying facts were not presented at the motions hearing, we rely on the allegations from the arrest warrant affidavit.

money from H.J. and drove her car to several different locations before ending up at a secluded area, where he demanded that she undress, fondled her intimate parts, and forced her to fondle his. After driving to another isolated area, Barrios disabled H.J.'s phone and left her with her keys and her car. H.J. then drove to a friend's house and contacted the police.

¶3 The Arvada Police Department received the report from H.J. and began to gather evidence. Crime scene investigation detectives discovered and collected latent fingerprints from H.J.'s car. An Arvada detective ran the fingerprints through the system, which returned a match for Barrios. The address listed for Barrios was the home of his great-grandmother and legal guardian, Delma Trujillo. Arvada Police secured an arrest warrant for Barrios at that address, and it was executed by Denver SWAT at about 1 a.m., two days after the incident.

¶4 Detective Stephens, the lead investigator of the Arvada Police, arrived at Barrios's house at about 2 a.m. When Stephens arrived, Barrios was outside of the house being transferred from a marked Denver police vehicle to an Arvada police vehicle for his transport to the Arvada Police Department. Stephens wanted to interview Barrios. Because Barrios was a minor, Stephens sought to gain permission from Barrios's guardian and went inside Trujillo's house. Stephens found Trujillo sitting inside the house speaking with another detective. Trujillo was eighty-four years old and had been sleeping when police arrived. She identified herself to Stephens as Barrios's legal guardian, and Stephens asked her if she would be willing to accompany him back to the

3

police station for a formal interview with Barrios. In response, Trujillo asked Stephens, "Did he kill anybody?" When Stephens said no, Trujillo told him that she was not willing to leave the house. By now it was approximately 2 a.m.; it was mid-January and it was cold outside. Stephens told her that he could give her a ride and that her presence "would be ideal." Trujillo reasserted that she did not want to leave the house. At that point, Stephens went out to the crime scene van to retrieve an advisement waiver form.

¶5 Before returning to Trujillo, Stephens filled out portions of the advisement waiver form, including the date, the case number, the time, whom the form pertained to, and a brief description of what he was investigating. Specifically, Stephens wrote, "Taking H[]'s car, carrying a knife, and touching H[]."[3] Stephens then brought the form to Trujillo and "went through the rights" with her, including Barrios's *Miranda* rights. Trujillo signed the form in two separate spots indicating that she understood Barrios's rights, approved of any decision he made or would make to talk to the police, and was willing to waive her presence during any questioning. Trujillo was not offered an opportunity to speak with Barrios before signing the waiver, nor did she ask to speak with Barrios. At this point, there were approximately ten police officers and investigators searching the house, although Stephens was the only person from law enforcement speaking with

_____

[3] Detective Stephens wrote the victim's first name on the form. We use her initials here to protect her identity.

4

Trujillo. After Stephens finished speaking with Trujillo, he left and returned to the Arvada Police Department where Barrios was in custody.

¶6 Once Stephens arrived back at the police station, the booking officer informed him that Barrios wanted to speak with the lead investigator on the case. Barrios was taken to an interview room, where he was joined by Stephens. Stephens verbally advised Barrios of his *Miranda* rights and reiterated to Barrios that he did not have to speak with police. He also verbally advised Barrios that, since Barrios was a minor, he had an additional right to have a parent or guardian present at questioning. At that point, Stephens handed Barrios the advisement waiver form that Trujillo previously signed containing a written list of Barrios's rights, including his *Miranda* rights and, in boldface font, the right to have a parent or guardian present during questioning. Stephens read Barrios these rights and instructed him to put his initials next to each right if he understood the right. Barrios signed his initials next to each right. Before Barrios signed the waiver of rights form, however, he asked Stephens if his "rights would go out the window" if he signed. Stephens informed Barrios that his rights would not go away and that he could stop the interview at any time. Barrios then signed the advisement waiver form, acknowledging that he understood his rights—including the right to have a guardian present for the interview—and that he waived those rights. At that time, Stephens began questioning Barrios. Throughout the questioning, Stephens struck a casual tone with Barrios, using what the trial court described as a "young person's questioning mode . . . dropping the

5

F-bomb and cussing." The trial court concluded that this method of questioning, while probably unprofessional, did not impact the voluntariness of Barrios's statements.

¶7 Over the course of just under an hour, Barrios told Stephens his version of what happened and corroborated much of what H.J. had told police. At times, Barrios disagreed with H.J.'s version of events, especially the allegations that he used a knife and sexually assaulted her. By the end of the interview, however, Barrios implicated himself in several serious offenses. Ultimately, the People charged Barrios as an adult with eighteen criminal counts, including kidnapping, aggravated robbery, and sexual assault.

¶8 Barrios moved to suppress the statements he gave to Stephens, claiming, as relevant here, that there was a lack of an express waiver of parental presence as required by section 19-2-511. At the end of the hearing, the trial court granted Barrios's motion to suppress his statements. In making its decision, the court discussed factors bearing on the reliability of a waiver of rights as articulated in *Grant v. People*, 48 P.3d 543, 549–50 (Colo. 2002). In granting the motion to suppress, however, the trial court relied primarily on two findings: (1) the advisement waiver form minimized the seriousness of the offenses, and (2) the police did not bring Barrios back to his house to give him an opportunity to consult with Trujillo prior to his *Miranda* waiver. The court also stated that "if this were an adult that the police were dealing with, the Court would have found that [Barrios] was fully advised pursuant to *Miranda*, waived his rights, and the statements were voluntary."

¶9     The People filed this interlocutory appeal as authorized by section 16-12-102(2), C.R.S. (2018), and C.A.R. 4.1.

## II.  Analysis

¶10    We must determine, under the totality of the circumstances, whether the advisement waiver here was reliable.  To make this determination, we begin by looking to the express provisions of section 19-2-511.  Then, we evaluate the additional circumstances that bear on the reliability of the waiver.  Finally, we hold, under the totality of the circumstances, that the police detective complied with section 19-2-511 when he advised Barrios and his legal guardian prior to Barrios's waiver.

### A.  Standard of Review

¶11    A trial court's ruling on a motion to suppress presents a mixed question of fact and law.  *People v. Gothard*, 185 P.3d 180, 183 (Colo. 2008).  We defer to the trial court's factual findings if those findings are supported by competent evidence in the record; however, we review the trial court's legal conclusions de novo.  *Id.*

### B.  *Miranda* Advisement

¶12    Prior to any custodial interrogation, police officers must advise suspects of their constitutional rights to refrain from speaking with police and to have an attorney present during questioning.  *Miranda v. Arizona*, 384 U.S. 436 (1966); *People v. Platt*, 81 P.3d 1060, 1065 (Colo. 2004).  After a proper *Miranda* advisement, suspects may waive their rights, but the waiver must be "voluntary, knowing, and intelligent."  *Platt*, 81 P.3d at 1065.  The prosecution bears the burden of showing, by a preponderance of the evidence, that the

7

waiver is reliable. *Id.* Courts evaluate the reliability of a suspect's *Miranda* waiver based on the totality of circumstances, and "no single factor is determinative." *Id.* The purpose of a *Miranda* advisement is to "guard against involuntary incriminating statements" made by a suspect during a custodial interrogation. *People v. Probasco*, 795 P.2d 1330, 1333 (Colo. 1990). In Colorado, juvenile suspects, even if charged as adults, are afforded an additional protection: Their parent or guardian must be given the opportunity to be present during any custodial interrogation prior to any decisions made by the juvenile as to whether to waive his or her *Miranda* rights. *See* § 19-2-511(1). That right can also be waived. *See* § 19-2-511(5). This court, however, will not evaluate the wisdom of the choice to waive. *See People v. Janis*, 2018 CO 89, ¶ 28, 429 P.3d. 1198, 1204.

## C. Section 19-2-511

¶13 Section 19-2-511 provides that statements made by juveniles during any custodial interrogation are generally not admissible unless a parent or legal guardian is present. § 19-2-511(1). Statements may be admissible without a guardian's presence, however, if *both* the guardian and the juvenile expressly waive the guardian's presence in writing after they *both* receive a full advisement of the juvenile's rights. § 19-2-511(5). Section 19-2-511 provides, in relevant part:

> (1) No statements or admissions of a juvenile made as a result of the custodial interrogation of such juvenile by a law enforcement official concerning delinquent acts alleged to have been committed by the juvenile shall be admissible in evidence against such juvenile *unless a parent, guardian, or legal or physical custodian of the juvenile was present at such interrogation* . . . .
>
> . . . .

8

(5) Notwithstanding the provisions of subsection (1) of this section, *the juvenile and his or her parent, guardian, or legal or physical custodian may expressly waive the requirement that the parent, guardian, or legal or physical custodian be present during the juvenile's interrogation.* This express waiver must be in writing and must be obtained only after full advisement of the juvenile and his or her parent, guardian, or legal or physical custodian of the juvenile's rights prior to the taking of the custodial statement . . . .

(Emphases added.) The statute is designed to "ensure that any waiver of a juvenile's constitutional rights will be made knowingly and intelligently." *People v. Lehmkuhl*, 117 P.3d 98, 102 (Colo. App. 2004) (citing *People v. Blankenship*, 30 P.3d 698 (Colo. App. 2000)). In enacting section 19-2-511, the General Assembly "sought to ensure that the juvenile and parent were fully aware of the scope and content of the rights they were waiving and to impress upon them the importance of those rights." *Grant*, 48 P.3d at 549. To determine whether the juvenile received a proper *Miranda* advisement and responded with a reliable waiver, we first consider whether the express provisions of section 19-2-511 were satisfied. *See People v. Barrow*, 139 P.3d 636, 638 (Colo. 2006). If they were, we then look to all relevant factors that bear on the reliability of the waiver and decide, under the totality of the circumstances, whether the waiver was reliable. *See Grant*, 48 P.3d at 549–50.

## D. *Grant* and *Barrow*

¶14　The trial court looked to *Grant* and *Barrow* for direction. In *Grant*, we considered whether a juvenile advisement waiver that lacked the juvenile's signature nevertheless satisfied section 19-2-511's requirement that any waiver be in writing. *Id.* at 544. We held that it did. *Id.* Deeming the statute ambiguous, we noted the myriad circumstances that

9

may be present in a juvenile waiver case that "may bear on the reliability of [the] waiver." *Id.* at 549. Specifically, we presented the following non-exhaustive list of factors: (1) "where, when, and at what stage in the proceedings the writing appeared"; (2) "whether the juvenile and parent agreed to the writing simultaneously or separately"; (3) "whether their consent was garnered in person"; (4) "whether they were offered ample opportunity to consult" with one another; (5) "whether they did consult, privately or with the police present"; (6) "whether the [juvenile and the guardian] were aware that the written waiver was a statutory requirement"; (7) "whether there existed any evidence that signatures, if present, were coerced"; and (8) "whether any other evidence supports or undermines the validity of the waiver." *Id.* at 549–50. We emphasized, however, that courts "should examine all relevant circumstances bearing on the reliability of the written waiver and uphold it when appropriately supported." *Id.* at 550. Ultimately, we held that the waiver of rights was reliable, noting that "the waiver was in writing, bore the signature of a parent, was obtained after full advisement, and was supported by ample evidence that the juvenile consented." *Id.* at 545.

¶15    In contrast to *Grant*, we found that the juvenile in *Barrow* "was not fully advised and did not expressly waive his right to have a parent present." 139 P.3d at 639. In *Barrow*, after police located and arrested the juvenile, they transported him to the police station and contacted his mother. *Id.* at 637. His mother came down to the police station and spoke with her son, first with police in the room and then in private; she then signed the advisement waiver form and went home. *Id.* Shortly thereafter, police advised the

10

juvenile of his *Miranda* rights with the waiver form that his mother had signed. *Id.* at 638. He indicated that he understood his rights and signed the waiver form. *Id.* The advisement waiver form, however, did not inform the juvenile that he had a right to have a parent present during questioning, and police did not verbally advise him of that right. *Id.* at 639. We therefore held that the juvenile was not fully advised of his rights and therefore did not expressly waive his parental presence right pursuant to section 19-2-511. *Id.* With our understanding of these cases in mind, we now to turn to the instant matter and determine whether the advisement waiver here was reliable.

## E. Application

¶16     The trial court concluded that the prosecution did not establish a reliable waiver under the statute. The court was concerned that Stephens minimized the gravity of the offenses on the waiver form and that the police did not bring the juvenile defendant back to the house to consult with his great-grandmother. Specifically, the trial court noted that the police could have accomplished that without causing security concerns. We must determine whether these two concerns identified by the trial court undermine the reliability of a waiver that complied with the statute.

¶17     Here, the advisement waiver form listed in boldface type the parental presence right, which was initialed by Barrios. Stephens also verbally advised Barrios before the start of the interview that, in addition to his *Miranda* rights, he had the right to have a parent or guardian present because he was a juvenile. Stephens testified that he verbally informed Trujillo of that right as well and she signed the advisement waiver form

11

indicating that she understood it. Therefore, we conclude that the police here complied with the plain language of section 19-2-511.

¶18 While we found the waiver to be unreliable in *Barrow*, *Barrow* is distinguishable. In *Barrow*, we held that the advisement waiver was unreliable because the parental presence right was not given at any time. *Id.* In fact, a closer reading of *Barrow* indicates that we wholly relied on the police's failure to advise the juvenile that he had the right to have a parent or guardian present during police questioning as required by section 19-2-511. In so doing, we rejected the People's totality of the circumstances argument that the juvenile was already aware of his rights because of his prior criminal record, noting instead that the advisement of the parental presence right was plainly required by section 19-2-511. *Id.* In essence, we held that a juvenile's waiver of the right to have a parent or guardian present during any custodial interrogation could not be reliable if the juvenile was not advised of that right. *See id.*

¶19 Here, the trial court did not appear to dispute that Stephens complied with the statute. Rather, the trial court concluded that *despite* Stephens's compliance, the waiver was not sufficiently reliable because (1) Stephens minimized the potential offenses that Barrios was facing when he advised Trujillo, and (2) he failed to bring Barrios back home to consult with Trujillo before Barrios chose to waive his *Miranda* rights. We are not persuaded that either fact undermines the reliability of the waiver.

¶20 To be sure, the trial court's concern with how the police handled Trujillo's advisement is understandable. They clearly minimized the seriousness of the allegations

12

and arguably took advantage of the late hour and cold weather. But in evaluating the totality of circumstances, it is clear that Barrios waived his rights knowingly, voluntarily, and intelligently. Even though Stephens minimized the potential offenses on the advisement waiver form, Trujillo plainly knew it was a serious matter: The arrest warrant was executed by Denver SWAT at 1 a.m.; numerous police officers conducted a sweep of Trujillo's residence during the arrest; an extensive search was being conducted when she was advised; she testified that she "thought the worst"; and, significantly, her only question to the police was if Barrios had killed anyone. Considering all the circumstances, Trujillo was aware of the gravity of the situation, and Stephens's characterization of the offenses did not impact her decision in any meaningful way.

¶21    Similarly, the lack of actual consultation between Barrios and Trujillo does not undermine the reliability of the advisement waiver. As the *Grant* court noted, in determining the reliability of a waiver, lack of actual consultation between the juvenile and the parent or guardian is *a factor* to be considered, but it is not dispositive, and it is not required by the statute. *See* 48 P.3d at 549. Moreover, Trujillo was given an *opportunity* to consult with Barrios, as she was offered a ride to the police station where Barrios was being held. Indeed, Stephens told Trujillo it would "be ideal" if she went. She chose not to, despite knowing the situation was serious. Likewise, Barrios indicated no desire to consult with Trujillo. In fact, even before Stephens returned to the police department, Barrios expressed an interest in telling his side of the story and wanted to speak with Stephens. The trial court found that there were no concerns about Barrios's

13

*Miranda* advisement itself, concluding that if he were an adult, the court would find that *Miranda* was complied with and that the statements were voluntary. Barrios would now like us to graft a new requirement onto section 19-2-511 that mandates actual consultation between the juvenile and the parent or guardian to establish a reliable juvenile advisement waiver. We decline to do so. It is not within this court's purview to add language to a statute.

¶22 The purpose of the statute is to ensure that juvenile defendants do not make involuntary incriminating statements and are fully advised of their constitutional rights. Stephens was not coercive with Barrios and made sure that he was fully aware of his rights, telling Barrios multiple times that he did not have to talk and could end the interview at any time. Barrios chose to talk to Stephens, and while Trujillo may have had reasons to decline Stephens's request for her to come to the police station, ultimately she chose not to come and stated that it was Barrios's decision whether to talk to police. We therefore hold that the police detective complied with section 19-2-511 when he advised Barrios and his legal guardian prior to Barrios's waiver and that, under the totality of the circumstances, the concerns identified by the trial court do not undermine the reliability of the waiver.

## III. Conclusion

¶23 Accordingly, we reverse the trial court's order suppressing Barrios's statements, and we remand to that court for further proceedings consistent with this opinion.

**JUSTICE MÁRQUEZ** dissents, and **JUSTICE GABRIEL** and **JUSTICE HART** join in the dissent.

14

JUSTICE MÁRQUEZ, dissenting.

¶24    We have made clear that the purpose of section 19-2-511(1) is to ensure that a juvenile has a meaningful opportunity to consult with a parent or guardian before deciding whether to waive his constitutional rights and respond to questions during a custodial interrogation. Meaningful access to parental guidance prior to questioning provides at least some assurance that the juvenile's waiver of rights is made knowingly and intelligently. *See Grant v. People*, 48 P.3d 543, 549 (Colo. 2002) ("The crux of the statute . . . is that the juvenile have access to an adult who will help safeguard the child's constitutional rights in a custodial interrogation context.").

¶25    Here, the record establishes that the purpose of section 19-2-511 was not met. Sixteen-year-old Dominic Barrios and his eighty-four-year-old great-grandmother Delma Trujillo were separated in the middle of the night, and Barrios was never afforded any meaningful opportunity to consult with an adult guardian before he signed a waiver and incriminated himself in response to police questioning. In my view, the majority's holding diminishes the purpose of section 19-2-511 by minimizing the core importance of ensuring that "law enforcement actually afforded the juvenile an opportunity to consult with an adult *before* the police undertook the juvenile's interrogation." *Grant*, 48 P.3d at 549. For this reason, and because the trial court properly considered the factors we set forth in *Grant* to conclude that the People failed to establish a valid waiver under section 19-2-511(5), I respectfully dissent.

1

**I.**

¶26 Recognizing the unique vulnerabilities of juveniles who face police interrogation, the general assembly has chosen to provide protections beyond those applicable to an adult criminal defendant. Specifically, section 19-2-511(1), C.R.S. (2018), bars the admission of statements made by juveniles during police interrogation unless a parent, guardian, or legal or physical custodian of the juvenile is present during the interrogation, and both the juvenile and his guardian were advised of the juvenile's *Miranda* rights. Under section 19-2-511(5), the juvenile and guardian may expressly waive the right that the parent or guardian be present during questioning. However, any express waiver "must be in writing and must be obtained only after full advisement of the juvenile and his . . . guardian . . . of the juvenile's rights." *Id.*

¶27 We have observed that the crux of section 19-2-511 is to ensure that a juvenile who is subjected to police interrogation "ha[s] access to an adult who will help safeguard the child's constitutional rights," and specifically, that "law enforcement actually afford[s] the juvenile an opportunity to consult with an adult *before* the police under[take] the juvenile's interrogation." *Grant*, 48 P.3d at 549. As the majority correctly observes, this access to adult guidance prior to questioning serves to "ensure that juvenile defendants do not make involuntary incriminating statements and are fully advised of their constitutional rights." Maj. op. ¶ 22. In enacting section 19-2-511, the general assembly also sought to ensure that both the juvenile and his guardian are "fully aware of the scope

2

and content of the rights they [are] waiving and to impress upon them the importance of those rights." *Grant*, 48 P.3d at 549.

¶28   I agree with the majority that when examining a purported waiver under section 19-2-511(5), we begin with the express provisions of the statute. Maj. op. ¶ 10; *People v. Barrow*, 139 P.3d 636, 638 (Colo. 2006). I further agree that, after determining whether a written waiver was obtained from both the juvenile and his guardian prior to questioning, we must also assess the reliability of that waiver by examining the non-exhaustive list of factors set forth in *Grant*, including:

> (1) where, when, and at what stage in the proceedings the writing appeared;
> (2) whether the juvenile and guardian agreed to the writing simultaneously or separately;
> (3) whether their consent was gathered in person;
> (4) whether they were offered ample opportunity to consult;
> (5) whether they did consult, privately or with the police present;
> (6) whether the parties were aware that the written waiver was a statutory requirement;
> (7) whether there existed any evidence that signatures, if present, were coerced; and
> (8) whether any other evidence supported or undermined the validity of the waiver.

48 P.3d at 549-50.

¶29   When reviewing a suppression order, we review the trial court's application of the law to its factual findings de novo. *People v. Howard*, 92 P.3d 445, 448 (Colo. 2004). We will not disturb the trial court's factual findings, unless those findings lack competent support in the record. *Id*. Here, the trial court properly applied the *Grant* factors to conclude that Barrios and Trujillo did not validly waive their statutory rights under section 19-2-511, and its ruling finds ample support in the record.

3

¶30     At approximately 1 a.m. on January 19, 2017, a Denver Police Department SWAT team approached the house of eighty-four-year-old Delma Trujillo, whose sixteen-year-old great-grandson, Dominic Barrios, was suspected of carjacking, kidnapping, and sexually assaulting H.J.[1] in the parking lot of a local Target.  Trujillo awoke when the SWAT team shone lights into the house and called for Barrios to come out.  Trujillo met Barrios in the upstairs hallway and asked him "What did you do?" Barrios responded, "I'm coming out, Grandma."  Trujillo asked him, "Did you kill anyone?"  Barrios said no, and left the house.

¶31     After Barrios left, approximately ten officers entered Trujillo's home and began going through the house, accompanied by a police dog.  After the SWAT team cleared the house, investigators began to execute a search warrant and collect evidence.  An officer told Trujillo she could sit in her living room.

¶32     Detective Alan Stephens of the Arvada Police Department, lead investigator on the case, arrived at the scene around 2 a.m.  Stephens testified that Barrios was still outside the house when he arrived and was being photographed and transferred to the custody of Arvada police.

---

[1] Like the majority, we use the victim's initials to protect her identity.

¶33    Stephens estimated that he was at the house no more than fifteen to twenty minutes.  Upon entering, Stephens approached Trujillo, who identified herself as Barrios's guardian.  Trujillo asked Stephens something to the effect of, "He didn't kill anyone, did he?"  Stephens said no.  Stephens asked Trujillo if she would accompany him to the police station for a formal interview.  He explained that "her presence would be ideal" and offered to drive her there.  Trujillo stated that she would not leave the house.  Because Stephens wanted to record the interview on camera at the station, and because Trujillo "wasn't willing to leave the residence," Stephens went out to the crime scene van to get a section 19-2-511 waiver form.

¶34    When Stephens returned, he had pre-filled parts of the waiver form.  Although Stephens was investigating a possible aggravated robbery, kidnapping, and sexual assault, he put on the form that he wished to interview Barrios for "taking H[]'s car," "carrying a knife," and "touching H[]."  Stephens testified that he read the list of rights on the waiver form to Trujillo, including the right to have a guardian present during questioning.  Stephens did not specifically recall asking Trujillo if she understood those rights but testified that he typically would do so.  Stephens also did not recall what Trujillo said in response, but stated it was "not indicative of asking any further questions."

¶35    After reading the waiver form to Trujillo, Stephens asked again if Trujillo would come to the police station.  Trujillo was "sitting on her chair" and Stephens did not know if "she was unable to, or just didn't want to" leave the house, but she was not going to go

5

to the station. Stephens presented the waiver form to Trujillo, who signed the waiver of presence on the wrong line, in the place provided for the officer to sign. The waiver form stated that Trujillo "ha[d] been present for the advisement of rights," that she and Barrios "ha[d] talked about and underst[ood] these rights," and that she "approve[d] [Barrios's] decision to talk to [Stephens]."

**B.**

¶36 When Stephens arrived at the Arvada Police Station, he was informed that Barrios wanted to speak with the lead investigator. Throughout his video-recorded interview of Barrios, which began shortly before 3 a.m., Stephens adopted "a young person's questioning mode . . . dropping the F-bomb and cussing." Maj. op. ¶ 6. He began by explaining Barrios's *Miranda* rights. When Stephens reached the place on the waiver form that explains the right to have a parent or guardian present, the following exchange occurred:

> Stephens: Now because you're 16…
> Barrios: Yeah.
> Stephens: …so there's one extra right here for you and it says you have the right to have your parent, guardian, custodian present during questioning. Um, and obviously I told you that Miss Trujillo has said that, you know, she waives presence. She understands that we want to talk to you. She also understands that's your decision.
> Barrios: Yeah.
> Stephens: You know, she didn't throw you under the bus or nothing. She just says –says "Hey, he's a grown man. If he wants to – if he wants to say his piece, he can say his piece," you know what I'm saying. Okay? So with that in mind if you want to read your rights as they are right there and then initial…
> . . . .

Stephens:    You gotta sign that one too, yeah, that's – those are just both, uh – that bottom one specifically is a waiver of presence. And I just don't think she's – does she go out of the house much?
Barrios:     No.
Stephens:    No she doesn't look like she got around very well. All right. Let me sign too, real quick.

¶37    After waiving his rights, Barrios corroborated much of what H.J. told the police and implicated himself in several serious crimes. Barrios was subsequently charged as an adult with eighteen counts, including kidnapping, aggravated robbery, and sexual assault.

**C.**

¶38    Barrios moved to suppress his statements to Stephens, arguing in part that he did not validly waive his right to have a guardian present during his interrogation. Both Stephens and Trujillo testified at the suppression hearing. Trujillo testified that she did not recall anyone reviewing *Miranda* rights with her or informing her of her right to be present during any interrogation of her great-grandson. She also did not remember being handed a waiver to sign, but did acknowledge her signature on the waiver form. In so doing, she misidentified the initials next to each individual *Miranda* right as her own, before being asked if they were in fact Barrios's initials.

¶39    The trial court ultimately granted Barrios's motion to suppress, concluding that although Barrios had validly waived his rights under *Miranda*, the People did not establish an effective waiver of the right to presence of a guardian during questioning

7

under section 19-2-511. Citing *Grant v. People*, 48 P.3d 543 (Colo. 2002), the trial court examined the circumstances bearing on the reliability of the waiver.

¶40 The trial court found that Stephens significantly minimized the reasons for wanting to question Barrios, noting that nothing on the waiver form presented to Trujillo indicated that Barrios was in fact being investigated for aggravated robbery, kidnapping, and sexual assault.

¶41 The trial court also expressly found that Barrios and Trujillo were "given no opportunity to consult," and that "the police controlled that." The court noted Trujillo never said she did not want to be present for an interview, but merely indicated she did not want to leave the house. The court noted that when eighty-four-year-old Trujillo was presented with the waiver form, it was 2 a.m. on a cold day in January, she had been sleeping, and there were still a number of police officers at the house. The court emphasized that under the circumstances, the police could have given Barrios an opportunity to consult with Trujillo at the house before waiving his rights, and that there were no security concerns preventing police from providing that opportunity. Having been provided no opportunity to consult, Barrios and Trujillo never actually consulted before signing the waiver. The court also found that the parties were not informed that the written waiver was a statutory requirement.

## III.

¶42 Here, the trial court properly applied the *Grant* factors to determine that the People failed to establish a valid waiver of the statutory right to have a guardian present during questioning. Ample evidence in the record supports the trial court's conclusion.

¶43 First, the trial court properly considered "where, when, and at what stage" the waiver appeared, and "whether the juvenile and parent agreed to the writing simultaneously or separately." *Grant*, 48 P.3d at 549. Trujillo signed the waiver at her home, at 2 a.m., after being awakened by a SWAT team outside her house, after Barrios had left and was taken into custody—and while her home was still actively being searched by ten or more officers. Barrios separately signed his waiver at the police station about an hour later, close to 3 a.m., having already been separated from Trujillo, and while in police custody.

¶44 Next, the trial court considered whether Trujillo and Barrios were "offered ample opportunity to consult" and "whether they did consult, privately or with the police present." *Id*. The court expressly found that Barrios and his great-grandmother were "given no opportunity to consult." This is a finding of fact entitled to deference on review. *See People v. Howard*, 92 P.3d 445, 448 (Colo. 2004). And the record supports this finding. According to Stephens's testimony, Barrios was apparently still outside the house when Stephens arrived. Although Barrios was in the process of being transferred to the custody of Arvada police, the record reveals no apparent reason why he could not have been given an opportunity to consult with Trujillo at the house before being

transported to the station or returned briefly to the house for that purpose prior to his interview.

¶45    I respectfully disagree with the majority that, under the circumstances reflected in the record before us, the offer to drive an elderly woman to a police station at 2 a.m. on a cold January night, while several officers were still actively searching her house, constituted "ample opportunity to consult" with her great-grandson before he waived important constitutional rights.  I further disagree with the majority's suggestion that Trujillo "chose not to" consult with Barrios.  Maj. op. ¶ 21.  The trial court expressly found (and the record is clear) that Trujillo did not say she did not want to consult with Barrios; instead, she simply said she did not want to leave the house.  Stephens himself acknowledged that he was not sure whether Trujillo did not want to leave the house or whether she was unable to.  In my view, the record shows Trujillo was provided no meaningful opportunity, let alone "ample opportunity," to consult with Barrios before he waived his *Miranda* rights and made incriminating statements.

¶46    Similarly, Barrios was offered no meaningful opportunity to consult with Trujillo.  By the time he was presented with the waiver form at 2:49 a.m., he had been physically separated from her and was in custody at the police station.  At no point was he ever offered an opportunity to consult with his guardian before waiving his *Miranda* rights.

¶47    Finally, the trial court also considered "whether the parties were aware that the written waiver was a statutory requirement," *see Grant*, 48 P.3d at 549, and concluded that the parties were not, in fact, aware that the waiver was a statutory requirement.

¶48    Importantly, the last *Grant* factor requires trial courts to consider "whether any other evidence supports or undermines the validity of the waiver." *Id.* at 550. In my view, additional evidence in the record undermines the validity of the waivers under section 19-2-511(5). Trujillo's suppression hearing testimony reveals her confusion on the night of Barrios's arrest and calls into question her understanding of what she was signing, particularly given the late hour and chaotic environment. In addition, the record supports the trial court's conclusion that Stephens minimized the allegations Barrios was facing, as even the majority recognizes. Maj. op. ¶ 20. When presented the waiver form to sign, Trujillo plainly was not informed of the true nature of the investigation. And in my view, Stephens' failure to do so is inconsistent with the statutory purpose of the advisement under section 19-2-511. I therefore disagree with the majority that Trujillo was in fact "aware of the gravity of the situation." Maj. op. ¶ 20.

¶49    Finally, in my view, Stephens' exchange with Barrios subtly encouraged him to waive his right to have his great-grandmother present. Immediately after being told that he "ha[d] the right to have [his] parent, guardian, custodian present during questioning" Barrios was told that his great-grandmother "waive[d] presence." Stephens did not explain what that meant, nor did he clarify that Barrios had an independent right to insist that his great-grandmother be present regardless of her purported waiver. Instead, Stephens used Trujillo's signed waiver to encourage Barrios to waive, indicating that "she [Trujillo] just says - says 'Hey, he's a grown man. If he wants to - if he wants to say his piece, he can say his piece,' you know what I'm saying. Okay? So with that in mind if

11

you want to read your rights as they are right there and then initial . . . ." Stephens' statement implied that Barrios was enough of an adult that he did not need to consult with his great-grandmother before deciding whether to proceed with the interview.

¶50 While pointing to the place where Barrios needed to sign on the waiver form, Stephens further implied that having his great-grandmother present would be difficult for her: "You gotta sign that one too, yeah, that's – those are just both, uh – that bottom one specifically is a waiver of presence. And I just don't think she's - does she go out of the house much? [Barrios: "No."] No, she doesn't look like she got around very well." Although Stephens' manner was not coercive, his exchange with Barrios goes to whether Barrios understood that he had an independent right to have his guardian present regardless of her purported waiver. *Cf. People v. Barrow*, 139 P.3d 636, 639 (Colo. 2006) (concluding that juvenile was not fully advised where he was presented a form signed by his mother indicating her permission for the interview to proceed but was not advised that he had the right to insist his mother be present before the interrogation could proceed). In my view, this additional evidence further undermines the validity of the waiver in this case.

**IV.**

¶51 Contrary to the majority's assertion, Barrios does not argue for grafting a new requirement onto section 19-2-511 that "mandates actual consultation." Maj. op. ¶ 21. Rather, the core purpose of section 19-2-511 is to ensure that a juvenile is afforded a meaningful opportunity to consult with a parent or guardian before police interrogation

12

and before deciding whether to waive important constitutional rights. *Grant*, 139 P.3d at 549. In my view, that core purpose was not met here. Moreover, I fear the majority's holding today minimizes the importance of that meaningful opportunity and undermines our holding in *Grant*. Accordingly, I respectfully dissent.

I am authorized to state that JUSTICE GABRIEL and JUSTICE HART join in this dissent.